UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUGUSTA A. JOHNSON,

               Plaintiff,                          Civil Action No. 12-12972

        v.                                 District Judge Denise Page Hood
                                               Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Plaintiff Augusta A. Johnson appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for social security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 4) are the parties' cross-motions for summary judgment (Dkts. 12, 17). For the reasons set forth below, this Court finds that the Administrative Law Judge's finding that Johnson's impairments did not satisfy the *de minimis* standard of severity at step two of the disability analysis is not supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

**I. BACKGROUND**

Johnson was 45 years old when he alleges he became disabled (*see* Tr. 105) as a result of

strokes, paralysis in his right leg and right arm, and pain in his back, left hip, and leg (*see* Tr. 37, 127). Johnson last worked around 2005 as a self-employed landscaper. (Tr. 128.) He does not have a high school diploma or GED. (Tr. 36–37.)

### A. Procedural History

On September 30, 2008, Plaintiff applied for supplemental security income asserting that he became unable to work on September 24, 2008. (Tr. 54.) The Commissioner initially denied Plaintiff's disability application on February 6, 2009. (*Id.*) Plaintiff then requested an administrative hearing, and on August 19, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") David Gatto, who considered his case *de novo*. (Tr. 32.) In a September 2, 2010 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 28.) The ALJ's decision became the final decision of the Commissioner on May 2, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on July 6, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

Johnson suffered a cardiovascular accident ("CVA") on September 24, 2008. (Tr. 197.) He went to the hospital complaining of numbness in his right upper arm and right face that had lasted about a day but had resolved by the time of his examination. (Tr. 191.) The examining doctor diagnosed a "left thalamic infarct, now without any residual deficits … likely to be due to microvascular disease." (*Id.*) A CT of the brain showed "a small hypodensity in the left thalamic location as a previous lacunar infarct of uncertain age" with "no acute intracranial bleed." (Tr. 195.) A follow-up CT of Johnson's brain the next day showed the infarct was stable. (Tr. 194–95.) A CT of Johnson's neck showed "no significant narrowing or obstruction or stenosis" and "no discrete aneurysm." (Tr. 193–94.)

Internist Atul C. Shah examined Johnson on December 30, 2008, at the request of Michigan's Disability Determination Service ("DDS"), a state agency that helps the Social Security Administration evaluate disability claimants in Michigan. (Tr. 209–12.)

Johnson told Dr. Shah that he had shortness of breath on exertion, occasional headaches and dizziness, occasional swelling in his ankles and feet that was relieved by raising his lower extremities, and some lapse of memory since his September 2008 stroke. (Tr. 209.) He said he was "doing much better with his strength" since the stroke, and he denied chest pain and tingling or numbness in the right upper or lower extremity. (*Id.*) He reported vision problems in his left eye since the stroke, including tunnel vision, and ringing in both ears. (Tr. 209–10.) Johnson said he had knee pain in his left knee since it was "smashed" in a work accident in 1987, "worse with prolonged walking and standing and climbing stairs" and "sometimes his knee gives out completely." (Tr. 210.) He also reported "lower back pain off and on for the last 5–6 years or more," "pain in his hips and left ankle off and on because he has been favoring his left knee and left leg," and "aches and pains in different joints." (*Id.*) He said he could not walk more than about two blocks or stand for more than 15 to 20 minutes. (*Id.*)

On examination, Dr. Shah found that Johnson's vision was 20/40 on both sides. (*Id.*) Otherwise his examination findings appear completely normal. (See Tr. 210–11.) For example, he found "no tenderness in the lumbosacral spine," no joint deformity or enlargement, deep tendon reflexes within normal limits, negative bilateral results on straight-leg raising, "[h]eel walk, toe walk, tandem walk, Romberg, finger to nose testing, squatting and recovery from squatting . . . all fairly well done," "[g]ross and fine dexterity . . . bilaterally intact," "no

3

abnormal movement," "no muscle weakness or paralysis," normal speech, and "[m]emory is good." (Tr. 211.)

Dr. Shah diagnosed "[h]igh blood pressure with hypercholesterolemia," "[c]erebral vascular accident with right-sided hemiparesis with good recovery," "[c]hronic left eye vision disturbances after the stroke," "[c]hronic lower back pain which is mild," and "[c]hronic left knee traumatic arthropathy after an accident." (Tr. 212.) He concluded: "Based on today's examination, the patient has severe restrictions and medical impairments after the stroke. He has vision problems and back pain which may hamper occupational ability at this time." (Tr. 211.)

On February 5, 2009, Johnson's medical records were reviewed by another DDS consultant, Muhammad Mian, M.D. (Tr. 217.) Dr. Mian opined that Johnson's physical impairments were non-severe. (*Id.*)

In March 2009, Johnson suffered another stroke. (*See* Tr. 218, 227.) March 17, 2009 CT scans of Johnson's head and neck showed that "[t]he left internal carotid artery ha[d] become completely occluded at its origin since the prior CT angiogram of the neck dated 25 September 2008," but there was "no stenosis at the origin of the right internal carotid artery," no "evidence of intracranial arterial occlusive disease or aneurysm," and both vertebral arteries, the basilar artery, and the anterior and posterior and middle cerebral arteries on both sides were patent, or unobstructed. (Tr. 221, 225.) A brain CT scan revealed "some cortical atrophy," "[o]ld ischemic infarcts . . . in the left frontal lobe and the right frontal lobe," and "some old lacunar infarcts seen in [the] left parietal white matter and left parieto-occipital cortex," but "no intracranial hemorrhage or hydrocephalus or shifting of the ventricles." (Tr. 222.) The reviewing doctor,

4

Joseph Metes, M.D., suggested that "[t]hese findings may be related to some sort of embolic phenomenon," and "[c]linical correlation is advised." (*Id.*)

On May 7, 2009, Johnson was examined by vascular surgeon Tamer N. Boules. (Tr. 227–28.) Dr. Boules reviewed the reports of consultations and imaging from Johnson's hospital stays, but was not able to review the primary images. (Tr. 228.) He opined that "it is clear that the left internal carotid artery based on the interpretation of the radiologist, is completely occluded from its origin to the intracranial segment," but that Johnson had "recovered from this neurologic event with only minimal numbness in the right arm." (Tr. 228.) Dr. Boules "suspect[ed] the most likely etiology is a[] cardioembolic source with complete occlusion of his internal carotid from a larger embolus," and recommended "completion of his cardiac evaluation if this has not been done already" and "more intensive monitoring of his right internal carotid artery with surveillance." (Tr. 228.) He also stated that Johnson "should remain on his antiplatelet agents indefinitely." (*Id.*) He concluded there was "no role for any surgical management in the setting of complete internal carotid artery occlusion." (*Id.*)

Based on his May 2009 examination, Dr. Boules completed a "medical examination report" form for the Michigan Department of Human Services on July 22, 2009. (Tr. 229–30.) He identified "left carotid artery occlusion" as Johnson's current diagnosis, with "history of strokes 3/09 with carotid occlusion." (Tr. 229.) He indicated that Johnson's condition was stable (not improving or deteriorating). (Tr. 230.) Dr. Boules checked a box signifying that Johnson had no physical limitations, but he also wrote "unknown" when asked about "lifting/carrying" and "standing/walking and sitting" restrictions. (Tr. 230.) He indicated that Johnson should be

5

able to repetitively operate foot/leg controls on both sides and use both hands for repetitive action such as grasping, and reaching. (*Id.*) He wrote "unknown" for fine manipulation with both hands and left blank the space for pushing/pulling with both hands. (*Id.*)

Johnson was again admitted to the hospital on August 19, 2009, with "acute onset of right facial drooping, with swea[t]ing, dysarthria as well as mild dysphagia," and "recent tunnel vision in the left eye." (Tr. 232.) The diagnosis was acute CVA, left carotid occlusion and tobacco use. (*Id.*) The hospital examination notes state that Johnson "had been taking Plavix at home but had discontinued this approximately two weeks prior to admission secondary to inability to afford the medication." (*Id.*) A CT scan of his brain showed "old encephalomalacia and change in the left frontoparietal convexity," but "no evidence of an acute intracranial bleed." (*Id.*) In an MRI of his brain, "the previous ischemic change in the left frontoparietal convexity was noted with additional small cortical acute infarct in the left parietal convexity," and "[m]ild brain atrophy associated with chronic white matter ischemic change was noted," but "[t]here was no evidence of enhancing mass in the brain." (*Id.*) A carotid Doppler showed occlusion of the left internal carotid artery and "1–19% stenosis of the right internal carotid artery" but "bilateral antegrade vertebra artery flow." (*Id.*) An echocardiogram "showed left ventricular with preserved systolic function and an ejection fraction of 60%" and "mildly to moderately increase[d]" wall thickness but no mass. (Tr. 232.)

A December 9, 2009 MRI of Johnson's brain showed "[c]hronic infarct in the left frontal lobe" and "[m]ultiple nonspecific foci of increased T2 signal in bilateral periventricular white matter, pons and left thalamus, likely ischemic," but "[n]o evidence of acute infarction or acute

6

intracranial hemorrhage." (Tr. 239–40.)

The record before the Court also includes medical records from Detroit Medical Center for June 2010 (Tr. 244–53) and from Professional Medical Center for January and March 2010 (Tr. 245–58). Because this evidence was not part of the record before the ALJ, the Court will not summarize it here. (*See* Tr. 36, 37, 41.) *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

**C. Testimony at the Hearing Before the ALJ**

*1. Plaintiff's Testimony*

At the August 19, 2010 hearing before ALJ Gatto, Johnson testified that he was unable to work because "my right leg and my right arm are non-functional right now. I can't do anything with it. I'm right-handed, and there's a lot I can't do with it, at all." (Tr. 37.) He said as a result of his stroke, "I can't control my arm" and "[m]y arm is, like, shaky and everything, like it's doing now." (Tr. 38.) When asked about it by his lawyer, Johnson said that the shaking was constant, making it difficult to hold a pencil and write letters and numbers. (Tr. 43–44.)

When ALJ Gatto asked Johnson what he did during a typical day, Johnson testified: "Mostly, just, sit down. I can't do anything, not properly anyway." (Tr. 38.) He said he tried not to leave the house because of his "balancing problem, with my leg and everything," and mostly just "stay[ed] on the porch or something like that" if he did go outside. (Tr. 42.) His brother, whom he lived with, did the shopping. (*Id.*) Johnson said he used to walk to the store, but had not done so in about three months because he "get[s] so tired now." (Tr. 42–43.) When his lawyer asked what he needed help with at home, Johnson said "[p]retty much everything" including "getting dressed, bathroom, tub—getting in and out of the tub, and stuff like that." (Tr.

7

44.) He said he did not cook, other than using the microwave. (Tr. 47.)

Johnson testified that he could stand "maybe 15 minutes at a time" before needing to sit down "for a while." (Tr. 39.) He said he could only walk about a block or block and a half "at the most" before needing to rest. (Tr. 42–43.) He said he had trouble gripping, and often dropped things. (Tr. 44.) He tried to use his left hand to lift things. (Tr. 46.) With his right hand, he said, he might be able to hold a gallon of milk "for a second" before having to put it down. (Tr. 46–47.) Johnson said he could not bend down very well, and when he tried to squat "[i]t pretty much locks up" and he had a hard time getting back up. (Tr. 45.) When asked by his lawyer, Johnson agreed that he forgot things easily since his stroke. (Tr. 48.)

ALJ Gatto asked Johnson about the four-point cane he was using at the hearing. (Tr. 39.) Johnson said he borrowed it from a friend because his insurance would not cover his own, but that he did have a prescription for a cane, from a Dr. Gardi at Harper Hospital, also known as Detroit Medical Center at Wayne State University. (Tr. 39–40.) When asked about it by his lawyer, Johnson said he needed the cane because of "balance problems" and because his leg and foot were still numb. (Tr. 45–46.) His said his leg did not work correctly—"it's real lazy, I guess"—and his foot dragged, which sometimes caused him to trip and fall. (Tr. 47–48.) He said he had chronic problems with his knee, which "swells." (Tr. 48.) He also testified that he had pain in his foot "most of the time" but that he did not take any medication for it. (Tr. 46.)

Johnson said that he underwent catheterization at Harper Hospital on July 29, 2010, after imaging "to see if I had any more blood clots in my heart, in my chest area." (Tr. 40–41.) During the hearing, it came to light that Johnson's medical records from Harper Hospital for that

8

surgery, as well as his records from Professional Medical Center for the previous six months were not part of the record. (Tr. 37, 41.) ALJ Gatto told Johnson's attorney "I'll give you 15 days for now. If you need more time, just let me know." (Tr. 49.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual who was "a younger individual with a limited education," with no past relevant work, who "was status post cardiovascular accident, was treated for hypertension and a diagnosis of obesity," and that combination of impairments limited him to "light work, occasionally lifting up to 20 pounds, frequently lifting 10 pounds or less; and, standing and walking for up to six hours out of an eight-hour day; and, sitting for up to two hours out of an eight-hour day." (Tr. 49–50.) The VE testified that such an individual could perform some light, unskilled work, including some assembly (approximately 8,500 jobs in southeast Michigan), some inspection (approximately 4,000 jobs in southeast Michigan), and some packaging (approximately 3,400 jobs). (Tr. 50.)

The ALJ next asked about job availability for the same individual if limited to "sedentary work, occasionally lifting up to 10 pounds, frequently lifting less than 10 pounds; and, standing and walking for up to two hours out of an eight-hour day; and, sitting about six hours out of an eight-hour day." (Tr. 50.) The VE identified some assembly jobs (approximately 2,100 in southeast Michigan), some inspection jobs (approximately 950 in southeast Michigan), and some packaging jobs (approximately 800 in southeast Michigan). Johnson's attorney asked the VE

9

whether the assembly, inspection, and packaging jobs were normally performed sitting or standing. (Tr. 51.) The VE said "[m]any of them allow for sitting or standing," but they were "normally performed" sitting. (*Id.*)

When the ALJ asked whether the hypothetical person would be competitively employable if he "were likely to be absent more than two days per month . . . and were limited to sedentary work . . . [and] only occasional gross or fine manipulation with the dominant right hand," the VE said he would not. (Tr. 50–51.) In fact, if the person was not absent more than twice per month but still limited to only occasional gross or fine manipulation of the right hand, there would still be no jobs available, according to the VE. (Tr. 52.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R.§§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Gatto found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of September 20, 2008. (Tr. 22.) At step two, he found that Plaintiff had the following medically determinable impairments: status post cardiovascular accident, hypertension, and obesity. (*Id.*) But the ALJ determined that Plaintiff did not have an impairment or combination of impairments that significantly limited or was expected to significantly limit his ability to perform basic work-related activities for 12 consecutive months. (Tr. 22–28.) The ALJ therefore concluded that Johnson did not have a severe impairment or

11

combination of impairments and was not disabled as defined by the Social Security Act from the date the application was filed, September 30, 2008, through the date of his decision. (Tr. 28.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v.*

*McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Johnson argues that the ALJ erred by finding that his impairments did not satisfy the *de minimis* standard of step two severity. (Pl.'s Mot. Summ. J. at 5.) Specifically, Johnson argues that the ALJ ignored "consistent medical evidence showing repeated CVAs or strokes with significant degradation of Mr. Johnson's carotid arteries and resultant functional effects" that "more than satisfied step two's *de minimis* severity standard." (*Id.* at 7.) Johnson further argues that the ALJ improperly relied on non-examining DDS consultant Dr. Mian's February 2009 opinion, which did not take into account Johnson's March and August 2009 strokes, and Dr. Boules's July 2009 opinion (based on a May 2009 examination), which also did not take into account the August 2009 stroke. (*Id.*) In support of his argument that it was improper to rely on the "outdated" opinions, Johnson cites *Morales v. Apfel*, 225 F.3d 310, 319-20 (3rd Cir. 2000), for the "holding that it is improper to rely on an opinion from a non-examining state agency source that was proffered before important evidence was added to the record." (Pl.'s Reply at 3.)

13

The Commissioner argues that "[s]ubstantial evidence supports the ALJ's conclusion that Johnson did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities." (Def.'s Mot. Summ. J. at 5.) It was reasonable to rely on the opinions of Dr. Boules and Dr. Mian, the Commissioner says, quoting *Kelly v. Commissioner of Social Security*, 314 F. App'x 827, 831 (6th Cir. 2009): "There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." (Def.'s Mot. Summ. J. at 6.)

Johnson is correct that the Sixth Circuit "construes the step two severity regulation as a *de minimis* hurdle . . . intended to screen out totally groundless claims." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (internal quotation marks and citations omitted). "Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The Court is troubled by the ALJ's truncated analysis, which ends at step two despite finding that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. 25.) Although the ALJ went on to hedge that the claimant's allegations were not credible to the extent they were inconsistent with his conclusion that they were non-severe, this seems inconsistent with the very low standard for severity. Because this is not a case where the claims are "totally groundless," *cf. Nejat*, 359 F. App'x at 576, the ALJ should have continued with the

14

analysis beyond step two. The Court also agrees with Johnson that the ALJ relied too heavily on opinions rendered before Johnson suffered additional strokes.

The case that the Commissioner cites, *Kelly v. Commissioner of Social Security*, 314 F. App'x 827, addresses when an updated medical opinion must be obtained before a decision of disability based on medical equivalence can be made. *See Kelly*, 314 F. App'x at 830. The court's holding is based on Social Security Ruling 96–6p, which requires an updated medical expert opinion when "(1) there is evidence of symptoms, signs and findings that suggest to the ALJ or Appeals Council that the applicant's condition may be equivalent to the listings; or (2) when additional medical evidence is received that 'in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding' that the impairment does not equal the listings." *Id.* at 830; *see* SSR 96-6p, 1996 WL 374180 at *4. In this case, the ALJ never reached the step-three inquiry regarding medical equivalence. The Court declines to extend *Kelly*'s holding to a situation requiring the claimant to cross only a *de minimis* threshold.

The Third Circuit case cited by Johnson is also not especially helpful. In *Morales*, the court remanded an ALJ's decision that a claimant could return to his past relevant work where it "rest[ed] solely on a rejection of medically-credited symptomatology and opinion, the ALJ's personal observations and speculation, and the testimony of a non-examining vocational expert who considered only a hypothetical based on [the non-examining state agency psychologist]'s check-list report written in 1990, long before the record was complete, and only summarily approved in 1993." *Morales*, 225 F.3d at 319–20. The key point in *Morales* is the court's

15

statement that "a single piece of evidence is not substantial if the Commissioner failed to resolve a conflict created by counterv[a]iling evidence or if it is overwhelmed by other evidence—particularly that offered by a treating physician." *Id.* at 320. Here, Johnson does not argue that Dr. Boules's and Dr. Mian's opinions were in direct conflict with or "overwhelmed by" other evidence.

Nonetheless, the ALJ should have considered the timing of their opinions when determining how much weight to give them. The Commissioner does not dispute that Johnson suffered an additional stroke or strokes after their opinions were rendered. But the ALJ's analysis of their opinions, leading to the conclusion that they should be given "significant weight" (Dr. Mian) and "great weight" (Dr. Boules), fails to address the fact that their opinions pre-dated the additional stroke or strokes. (*See* Tr. 26, 26, 27.) The ALJ found that Dr. Mian "reviewed the claimant's file" without acknowledging that the file Dr. Mian reviewed did not include records of two additional strokes. (Tr. 26.) It is hard to see how the ALJ could reasonably conclude that Dr. Mian's opinion was "consistent with the record when viewed in its entirety" (*id.*) without discussing whether the additional strokes could have materially altered that opinion. Likewise, the ALJ's conclusion that "Dr. Boules's opinion is also consistent with the medical record when viewed in its entirety" (Tr. 27) does not acknowledge that the opinion predated a third stroke.

Even if this Court were to infer that the ALJ had analyzed the medical records that post-date Dr. Mian's and Dr. Boules's opinions and concluded that nothing changed, that finding is not supported by substantial evidence. Although the medical imaging reports—which are

16

virtually the only evidence available—are difficult for a layperson such as this Court to interpret, it is apparent that the imaging of Johnson's neck and brain showed changes after each new stroke. For example, a September 2008 CT of Johnson's neck showed "no significant narrowing or stenosis." (Tr. 193-94.) In March 2009, after Dr. Mian reviewed that evidence and concluded that Johnson's impairments were non-severe, a new CT scan showed that "[t]he left internal carotid artery ha[d] become completely occluded at its origin since the prior CT angiogram of the neck dated 25 September 2008." (Tr. 221.) Johnson's condition also changed after Dr. Boules's July 2009 opinion. In March, a brain CT scan revealed "some old lacunar infarcts seen in [the] left parietal white matter and left parieto-occipital cortex." (Tr. 222.) In August, a new brain CT showed "the previous ischemic change in the left frontoparietal convexity was noted with additional small cortical acute infarct in the left parietal convexity." (Tr. 232.)

Unfortunately, Johnson's medical records contain very little information about the functional effects of his impairments. There are only three sources of such information in the medical records: Dr. Shah's December 2008 opinion that Johnson had "severe restrictions" (Tr. 211), which the ALJ gave little weight; Dr. Mian's February 2009 opinion, based on review of the medical records, that Johnson's impairments were non-severe (Tr. 217); and Dr. Boules's July 2009 form report indicating that Johnson had "no physical limitations" but also indicating that his lifting/carrying, standing/walking/sitting, and fine manipulation restrictions were "unknown." (Tr. 230.) After Dr. Boules's report, the medical records contain little more than the bare fact that Johnson had another stroke, with no information about the continuing functional effects of the stroke, if any. (*See* Tr. 232-40.)

17

The only information about Johnson's functional impairments after the August 2009 stroke, then, comes from Johnson himself. Johnson's hearing testimony indicated that his impairments had worsened recently; for example, he said he had previously been able to walk to the store, but now gets too tired. (Tr. 42.) A comparison of the function report he completed on November 19, 2008, and the one he completed on April 7, 2010, also shows deterioration. (*See* Tr. 134-41; Tr. 172-79.) For example, in 2008, the only problems with personal care identified were "difficulty getting in [and] out of the tub" and "squatting to sit on toilet." (Tr. 135.) But in 2010, Johnson indicated that he had problems with dressing, bathing, hair care, shaving, feeding himself, standing to use the toilet, and sitting on the toilet because his right arm and leg were disabled; he also said his sister had to help him with hair care and shaving. (Tr.173.)

The Court recognizes that the ALJ found Johnson "less than fully credible." (Tr. 24.) But his analysis is problematic. He concludes that Johnson's allegations were "not substantiated by the medical record" (Tr. 24), but the medical records do not address Johnson's functional impairments after May 2009. Moreover, when the chronology is taken into account, many of the inconsistencies he identified can be reconciled as evidence that Johnson's condition was deteriorating. For example, the ALJ makes a lengthy comparison of Johnson's alleged impairments against the daily activities he identified in his November 2008 function report—but the ALJ barely mentions Johnson's more limited April 2010 function report. (Tr. 24–25.)

Chronology was critical in this case, where the claimant's condition continued to evolve. The ALJ's failure to consider the medical timeline when weighing the evidence was fatal to his analysis. The reasoning by which the ALJ decided to accord significant weight to the opinion of

18

Dr. Mian, to accord great weight to the decision of Dr. Boules, and to discount Johnson's credibility is not supported by substantial evidence. Because of these flaws, and because it appears to the Court that the *de minimis* standard of step two was met in this case, the ALJ's decision should be remanded.

Johnson also argues that ALJ Gatto "failed to obtain missing relevant medical evidence" and "prevented Mr. Johnson's counsel from obtaining that relevant medical evidence when the ALJ prematurely closed the record and issued a decision on September 2, 2010 [although he] had promised to keep the record open 15 days after the hearing, until September 3, 2010." (Pl.'s Mot. Summ. J. at 8.) The Commissioner "concedes that the ALJ should have allowed Johnson's attorney the full 15-day period to submit additional evidence but maintains that any resulting error was harmless" because the additional records merely "note Johnson's complaints of weakness and contain no relevant medical findings or opinions [and thus] do not contradict the ALJ's finding that no treating source imposed restrictions that would support a finding of disability." (Def.'s Mot. Summ. J. at 8–9.) Because this Court recommends remand for further evaluation of the evidence, the ALJ will be able to assess the additional evidence for himself to determine whether it supports Johnson's disability application. The Court need not reach this issue.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the Administrative Law Judge's finding that Johnson's impairments did not satisfy the *de minimis* standard of severity at step two of the disability analysis is not supported by substantial evidence. The Court therefore

19

RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. ' 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. ' 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: July 30, 2013

20

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 30, 2013.

s/Jane Johnson
Deputy Clerk

21